UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANE BUCHANAN, JAMES
CHRISTOPHER DUERR, NICOLE
NAPOLITANO, and WINSOME THELWELL,

                          Plaintiffs,

          v.

THE CITY OF NEW YORK, THE NEW YORK
CITY CIVILIAN COMPLAINT REVIEW
BOARD, and JONATHAN DARCHE, in his
Official and Individual Capacity,

                          Defendants.

---

21-Cv-660 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

This case involves four former employees of the New York City Civilian Complaint Review Board ("CCRB") who claim that they faced professional retaliation for engaging in constitutionally protected speech. Plaintiffs Dane Buchanan, James Christopher Duerr, Nicole Napolitano, and Winsome Thelwell bring this action pursuant to 42 U.S.C. § 1983, alleging official conduct in violation of the First Amendment. Plaintiffs also bring comparable claims under Article I, Section 8 of the New York State Constitution, as well as retaliation claims under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL"). Plaintiffs sue the City of New York, the CCRB, and CCRB Executive Director Jonathan Darche, who plaintiffs allege spearheaded a "campaign of retaliation and harassment" culminating in their November 2020 termination. (Compl. ¶ 5, ECF No. 7.)

Defendants have now moved to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, defendants' motion is granted in part and denied in part.[1]

I. BACKGROUND

The CCRB, an independent agency of the New York City government, is tasked with the oversight and investigation of alleged New York City Police Department ("NYPD") officer misconduct. The CCRB and its staff "receive, hear, make findings, and

---

[1] For purposes of this Rule 12(b)(6) motion, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in plaintiffs' favor. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir. 2008); *Qasem v. Toro,* 737 F. Supp. 2d 147, 150 (S.D.N.Y. 2010).

recommend action on complaints" against NYPD officers. (Compl. ¶ 17.) The Board itself consists of 15 political appointees,[2] and the agency employs roughly 200 investigators and staff. (Id. ¶¶ 18-19.) In addition to investigating police misconduct, the CCRB holds monthly open meetings and releases periodic reports on its activities and recommendations. (Id. ¶¶ 20-21.)

At the time of their terminations, plaintiffs Thelwell and Duerr served as the CCRB's Co-Chiefs of Investigations. Plaintiff Buchanan served as Deputy Chief of Investigations, and plaintiff Napolitano served as Director of Policy and Advocacy. (Id. ¶¶ 9-12.) Defendant Darche has been the agency's Executive Director since 2017. (Id. ¶ 15.)

This case centers on an increasingly bitter feud between plaintiffs and Darche over the CCRB's direction and performance. (Id. ¶ 5.) In plaintiffs' view, the CCRB had failed to fulfill its mandate to be "independent," acting instead with undue deference to the NYPD and the mayor's office. Darche, in particular, allegedly "skewed CCRB policies with a view toward currying favor with the NYPD and/or the Mayor's Office, for his own personal and professional gain." (Id. ¶ 27.) On several occasions, plaintiffs claim they voiced their disagreements with CCRB policies and practices, only to face harassment, retaliation, and ultimately termination. Plaintiffs focus on five instances of alleged protected speech, beginning in 2019 and continuing until their November 2020 firing, in which they raised their concerns to Darche and others within the CCRB.

First, in July 2019, Buchanan co-authored a memorandum with Olas Carayannis, CCRB Deputy Chief of Special Operations,[3] after consulting with Duerr and Thelwell. The document criticized a proposed agency policy that would have limited the ability of CCRB investigators to obtain footage from the cameras NYPD officers wear while on duty. (Id. ¶ 32a.) After receiving the memorandum, Darche called Buchanan, "enraged by the criticisms, and shouted: 'Who do I need to fire, Olas and you, or Olas, you, Chris [Duerr] and Winsome [Thelwell]?'" (Id. ¶ 32b.)

Plaintiffs continued to oppose the perceived lack of access to the footage, known as body-worn camera, or BWC, footage. In June 2020—as widespread protests following the death of George Floyd renewed public focus on police misconduct and accountability—Buchanan and Carayannis, again with input from Duerr and Thelwell, prepared "an unsolicited memo to all senior staff" addressing the issue. (Id. ¶ 32c.) The memorandum highlighted a "tremendous backlog in BWC requests," and "urge[d] the

---

[2] Five Board members are appointed by the NYC City Council, five are appointed by the mayor, three are appointed by the police commissioner, one is appointed by the public advocate, and the chair is appointed jointly by the mayor and the speaker of the City Council. (Id. ¶ 18.)
[3] Carayannis is a non-party to this action.

Agency to seize this moment to do everything in its power to obtain unmediated direct access to BWC footage." (*Id.*)

This document soon found its way into the press. Darche held Buchanan and Carayannis responsible for the leak, and "repeatedly threatened that their roles within the CCRB would suffer as a result." (*Id.* ¶ 32d.) Darche then instructed Duerr and Thelwell to "restructure Buchanan's and Carayannis's jobs so as to functionally demote them," but they refused to do so. (*Id.* ¶ 32e.)

Around the same time, Thelwell sent Darche an email criticizing the lack of access to the BWC tapes and a resulting backlog of cases. The email charged that the CCRB had failed to "equally and ethically serve the citizens of this City," and described the backlog as "outrageous and offensive." Thelwell further protested that "so far, all I have received for speaking out is anger and retaliation," citing her recent exclusion from docket review meetings she had previously attended. (*Id.* ¶ 33a.)

Soon thereafter, Buchanan, Duerr, Thelwell, and Carayannis, with input from Napolitano, circulated another unsolicited memorandum "condemning an agreement" with the NYPD officers' union that allowed officers to turn off their video feeds during remote interviews with CCRB investigators. (*Id.* ¶ 35a.) Plaintiffs wrote that the agreement prevented investigators from assessing nonverbal clues, undermining their ability to conduct "complete, thorough and impartial" investigations. The memorandum concluded: "We cannot take a step backward when the city demands we march forward." (*Id.*)

At 9 p.m. the same day, Darche and CCRB General Counsel Matthew Kadushin contacted Duerr to express anger at the memorandum. Darche stated his belief that plaintiffs were attempting to have him removed as Executive Director, that he "always comes out on top," and that he was "done making concessions" to Thelwell. Kadushin stated that they "had a plan on how to deal with her." (*Id.* ¶ 35b.)

Finally, in July, Napolitano prepared a memorandum addressed to Darche and CCRB Board Chair Fred Davie on instances in which panels of the Board overturned the recommendations of investigative staff, known as "flips." Napolitano argued that the politics of the particular Board members on each panel, rather than the merits of the complaint, determined which recommendations were flipped. (*Id.* ¶ 34a.) Buchanan, Duerr, and Thelwell had also raised repeated concerns about the frequency of flips. (*Id.* ¶ 35b.) After Napolitano submitted her memorandum, Kadushin contacted her to tell

her that the document was a "problem" and admonished her that "[n]obody told you to write that memo . . . . [T]hat's not what you were asked to do."[4] (*Id.*)

In addition to these incidents, plaintiffs claim that Darche created a "hostile work environment . . . in which [employees] were constantly subjected to intimidation, ridicule, insults, and threats." (*Id.* ¶ 37.) Plaintiffs allege that they opposed those practices and that they faced retaliation as a result. They describe four incidents of alleged misconduct.

First, in 2019, Darche "verbally attacked and threatened" Duerr and Thelwell when they "expressed a difference of opinion" at a staff meeting on a CCRB policy relating to 911 incidents. (*Id.* ¶ 41.) Darche responded by "telling them they were both fired, effective immediately." When Thelwell, a black woman, did not leave the room, Darche told her that "not only was she fired but that he would call 911 on her." (*Id.*) He did not similarly threaten Duerr, a white male. Darche subsequently rescinded their terminations. (*Id.*) Next, in early 2020, Darche told Thelwell—who is Jamaican—that he had met someone from a Jamaican police oversight agency and that she should consider getting a job there. (*Id.* ¶ 42.)

Third, during the COVID-19 pandemic, the CCRB continued to have three Black clerical employees work in the office, although when "White Investigators asked to return to the office, Darche said it was not safe." (*Id.* ¶ 40.) When Thelwell raised the inconsistency, "noting the disparate impact COVID has on communities of color, Darche and Kadushin told her it was none of her business." (*Id.*)

Finally, plaintiffs argue that they faced retaliation for "openly support[ing] a complaint" by Carayannis, who alleged discrimination based on Carayannis's transgender/gender-nonconforming status. (*Id.* ¶ 39.) In August 2020, Carayannis filed an internal complaint claiming that Darche "questioned Carayannis's professionalism and participation at certain events because of Carayannis's appearance." (*Id.*) Plaintiffs then attempted to attend a meeting convened to address the complaint, but they were refused entrance by the General Counsel, Kadushin. Carayannis subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), naming plaintiffs as potential witnesses. (*Id.*)

On November 12, 2020, all four plaintiffs were informed that they would be terminated effective two weeks later. The CCRB then moved their termination date to December 27. (*Id.* ¶ 43.) Almost immediately after learning of their firing, plaintiffs were "disconnected from access to the Agency server," including email, and had "no

---

[4] Napolitano, who previously worked at the NYPD Office of the Inspector General ("OIG-NYPD"), claims that she also faced pushback for "challeng[ing] Darche and the CCRB to be more transparent with the OIG-NYPD." (*Id.* ¶ 31.)

opportunity to effectively transition" their ongoing work product. (*Id.* ¶ 45.) Plaintiffs allege that their replacements have "significantly less experience with CCRB operations," and "barely any experience in a managerial or supervisory role." (*Id.* ¶ 46.)

One month after being terminated, plaintiffs brought this litigation against Darche, the CCRB, and the City of New York. Plaintiffs first allege, pursuant to 42 U.S.C. § 1983, that defendants' actions violated plaintiffs' "constitutional and lawful rights to speak out on matters of public concern" under the First and Fourteenth Amendments to the U.S. Constitution (Compl. ¶ 52), as well as their parallel rights under the New York State Constitution, *see* N.Y. Const. art. I, § 8. Plaintiffs also bring causes of action pursuant to the NYSHRL, N.Y. Exec. Law §§ 290 *et seq.*, and the NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq.*, alleging unlawful retaliation based on plaintiffs' opposition to discriminatory CCRB practices. (Compl. ¶¶ 66, 69.)

## II. DISCUSSION

As noted above, defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), alleging that plaintiffs have failed to state a valid claim to relief. Defendants contend that: (1) plaintiffs lack First Amendment protection because they spoke solely as public employees in furtherance of their official duties, and not as private citizens on matters of public concern; (2) plaintiffs' claims under the New York State Constitution are superfluous; (3) plaintiffs' NYSHRL and NYCHRL claims fail to allege any "protected activity" for which they faced retaliation; and (4) all plaintiffs' claims fail to state a causal link between their conduct and the alleged retaliation.

### A. Legal Standard Governing Motions to Dismiss Pursuant to Rule 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Though this standard requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *id.*, it "does not need detailed factual allegations," nor does it "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 555-56. Instead, a complaint need only "raise a reasonable expectation that discovery will reveal evidence" of unlawful conduct. *Id.* at 545.

### B. Defendant CCRB Is Not a Suable Entity

As an initial matter, defendants move to dismiss the CCRB from this action. The New York City Charter provides that "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y.C.

Charter § 396. Plaintiffs do not argue that any other provision allows the CCRB to face suit here. The CCRB is accordingly dismissed as a defendant.

### C. Plaintiffs Have Alleged Official Conduct Violating the First Amendment

#### 1. *Legal Standard Governing First Amendment Retaliation Claims*

It is well-established that public employees "do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). At the same time, the U.S. Supreme Court has recognized the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983). Accordingly, a court facing a First Amendment employment retaliation claim must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 568 (1968).

To strike this balance, the Court "conducts a two-step inquiry to determine whether a public employee's speech is protected." *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015). First, the Court determines "whether the employee spoke as a citizen on a matter of public concern." *Id.* (quoting *Garcetti*, 547 U.S. at 418). If the employee "did not speak as a citizen on a matter of public concern, the inquiry ends—the speech was not constitutionally protected." *Alvarez v. Staple*, 345 F. Supp. 3d 320, 329 (S.D.N.Y. 2018); *see Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010). Otherwise, the Court proceeds to the inquiry's second step, known as the "*Pickering* analysis." *See Pickering*, 391 U.S. at 568; *see also Matthews*, 779 F.3d at 172. Here, the Court evaluates whether the government "had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer." *Garcetti*, 547 U.S. at 418.[5]

If an employee establishes that her speech was constitutionally protected, she must demonstrate that "[1] the defendant took an adverse action against [her]; and [2] there was a causal connection between this adverse action and the protected speech" in order to prevail on her First Amendment claim. *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

---

[5] The *Pickering* analysis "demands a fact-sensitive inquiry generally unsuited for resolution on a motion to dismiss," *Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, No. 18-Cv-67 (VB), 2018 WL 6830865, at *7 (S.D.N.Y. Dec. 28, 2018) (quotation omitted), and defendants do not press the issue at this stage.

2.   *Plaintiffs Have Alleged That They Spoke as Citizens on Matters of Public Concern*

Defendants do not contest that plaintiffs' speech pertained to matters of public concern. Nor could they, as the U.S. Court of Appeals for the Second Circuit has affirmed that "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001)); *see also Garcetti*, 547 U.S. at 425 ("[G]overnmental . . . misconduct is a matter of considerable significance."). Instead, defendants maintain that plaintiffs, in each of their cited incidents, spoke not as citizens but solely as CCRB employees, and that they thus lack First Amendment protection as a matter of law.

To determine whether a public employee spoke as a citizen, the Court asks two questions: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (citing *Weintraub*, 593 F.3d at 201). Within this inquiry, "[a]lthough the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, '[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Montero v. City of Yonkers, New York*, 890 F.3d 386, 397-98 (2d Cir. 2018) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)).

"[C]onducting these inquiries sometimes has proved difficult," *Garcetti*, 547 U.S. at 418, due to "the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal," *Pickering*, 391 U.S. at 568. Courts have thus employed a "practical" approach, one focused on a plaintiff's "actual, functional job responsibilities." *Matthews*, 779 F.3d at 173-74 (quoting *Garcetti*, 547 U.S. at 424). As a result, "[t]he inquiry into whether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule. Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012).

As one might expect, "navigating the shoals" of this distinction "has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific." *Schultz v. Cty. of Suffolk*, No. 19-Cv-0925, 2020 WL 7699944, at *6 (E.D.N.Y. Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 7041090 (E.D.N.Y. Nov. 30, 2020) (quotation omitted). Accordingly, district courts frequently deny as premature pre-discovery motions to dismiss on the grounds that the plaintiff spoke as an employee. *See, e.g., Schultz*, 2020 WL 7699944, at *6; *Brant v. N.Y.C. Health & Hosps. Corp.*, 2018 U.S. Dist. LEXIS 5428, at *10 (S.D.N.Y. Jan. 10, 2018) ("Without the benefit of a more complete record, the Court cannot hold, as a

matter of law, that plaintiff spoke as an employee rather than as a citizen."); *Brown v. Off. of State Comptroller*, 211 F. Supp. 3d 455, 466 (D. Conn. 2016) (holding that "due to inherently factual nature of the inquiry," a determination was "premature at the motion to dismiss stage"); *Hagan v. City of New York*, 39 F. Supp. 3d 481, 513 (S.D.N.Y. 2014) ("Defendants are not entitled to dismissal of this portion of [plaintiff's] claim at this early stage.").

The facts alleged here demonstrate the impropriety of resolving this situation-specific analysis before a record may be developed. As limned above, plaintiffs allege that they prepared a series of unsolicited memoranda and emails addressed to Executive Director Darche, Board Chair Fred Davie, and other CCRB senior leadership. (*See* Compl. ¶¶ 31-36.) Plaintiffs' statements—which challenged high-level CCRB policies and practices relating to BWC footage, CCRB complaint backlogs, Board-level decision-making, officer interview procedures, and NYPD-OIG relations—clearly pertained to matters of public concern. *See Jackler*, 658 F.3d at 236. Plaintiffs further represent that their input on these policies fell "outside their official job duties and responsibilities," and that they instead spoke "as citizens of New York, [standing] with the public in demanding greater accountability and transparency." (*Id.* ¶¶ 4, 29.) *Cf. Matthews*, 779 F.3d at 174 ("[W]hen a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen.").

Moreover, plaintiffs allege a civilian analogue, noting that the CCRB holds monthly public meetings, releases frequent reports, and indeed exists to receive and investigate complaints from the public. (Compl. ¶¶ 17, 20-22.) Darche, in particular, "is a point of contact for any individual who enquires about the CCRB's practices," and he "speaks directly to members of the public, fields phone calls from the public, and responds to email inquiries." (*Id.* ¶ 22.) A strong "indicium that speech by a public employee has a civilian analogue is that the employee's speech was to 'an independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Jackler*, 658 F.3d at 241 (quoting *Weintraub*, 593 F.3d at 204 ).

On the face of the complaint, then, plaintiffs have plausibly alleged speech protected by the First Amendment and raised a "reasonable expectation that discovery will reveal evidence" of wrongdoing. *Twombly*, 550 U.S. at 555-56. The critical question thus becomes plaintiffs' functional, day-to-day job responsibilities, and whether they spoke in furtherance of those duties. *See Matthews*, 779 F.3d at 173-74. However, "[b]ased only on the pleadings, the Court has no details about the nature of plaintiff[s'] actual job description, [their] ordinary reporting requirements to supervisors, and other facts that would illuminate the scope of plaintiff[s'] official job responsibilities." *Brant*,

2018 U.S. Dist. LEXIS 5428, at *8. Accordingly, the court is ill-equipped at this stage to "examine the nature of" those responsibilities and their relationship to the speech alleged. *Ross*, 693 F.3d at 306. Of course, developing these detailed factual supports for the parties' claims is precisely the role discovery is designed to serve. *See* Fed. R. Civ. P. 26(b)(1).

The Second Circuit's rulings in *Matthews* are illustrative. There, a police officer claimed he was fired for complaining to commanding officers about a traffic-stop quota system. After the district court granted a motion to dismiss Matthews' complaint on the grounds that he spoke in his official capacity, a panel of the Second Circuit reversed. *See Matthews v. City of New York*, 488 F. App'x 532, 533 (2d Cir. 2012). Citing the fact-based nature of the inquiry, the panel held that "[t]he record in this case is not yet sufficiently developed . . . to determine as a matter of law whether [defendant] spoke pursuant to his official duties when he voiced the complaints made here in the manner in which he voiced them." *Id.*

When the case came back before the Second Circuit after discovery, the panel conducted a close analysis of the developed record in determining that Matthews spoke as a citizen, not a public employee, when he opposed the quota policy. *Matthews*, 779 F.3d at 176. The panel's decision rested on its conclusion, after review of the NYPD Patrol Guide and various depositions, that "Matthews's actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders." *Id.* at 174. It is precisely this practical, fact-based inquiry that cannot be conducted on the pleadings alone.

In response, defendants here lean heavily on each of the four plaintiffs' "high-ranking" status within the CCRB, which allegedly proves that their policy-oriented speech was "clearly pursuant to their official duties." (Defs.' Mot. at 8 (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011)).) However, nowhere do plaintiffs concede that their day-to-day work involved high-level policy formation and implementation, let alone the formulation and implementation of the specific policies at issue here. Instead, defendants' deduction appears to be drawn from plaintiffs' job titles alone.[6] This inference may be borne out in discovery, but dismissing the complaint based on formal titles alone would fly in the face of the functional approach required by precedent.

Indeed, the Supreme Court has cautioned that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor

---

[6] As noted above, at the time of their terminations, plaintiffs Thelwell and Duerr served as the CCRB's Co-Chiefs of Investigations. Plaintiff Buchanan served as Deputy Chief of Investigations, and plaintiff Napolitano served as Director of Policy and Advocacy. (Compl. ¶¶ 9-12.)

sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties." *Garcetti*, 547 U.S. at 424-25. The relationship between an employee's job *title* and her "actual, functional job responsibilities," *Matthews*, 779 F.3d at 173-74, is only more attenuated. Were it otherwise, "employers [could] restrict employees' rights by creating excessively broad job descriptions." *Garcetti*, 547 U.S. at 425. Accordingly, defendants cannot use these titles at the motion-to-dismiss stage to defeat plaintiffs' well-pled complaint.

### 3. *Plaintiffs Allege a Causal Link Between Their Protected Speech and Their Termination*

Having alleged that they engaged in protected speech, plaintiffs must also state a claim that "the defendant took an adverse action against [them]," and that "there was a causal connection between this adverse action and the protected speech." *Cox*, 654 F.3d at 272. There is no question that plaintiffs' November 2020 terminations constituted adverse actions. *See, e.g., Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225-26 (2d Cir. 2006). Instead, defendants contend that plaintiffs have failed to adduce any causal connection between those internal complaints and their subsequent firings. (Defs.' Mot. at 12-13.)

In order to plead a causal connection, plaintiffs "must aver some tangible proof demonstrating that their protected speech animated [defendants'] decision" to terminate their employment. *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (quotation omitted). This burden may be met "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015).

Plaintiffs have easily met this burden, as the complaint alleges both direct and indirect evidence of causation. Indeed, contrary to defendants' contention that plaintiffs "do not proffer any factual allegations demonstrating that their internal complaints were the cause of their terminations" (Defs.' Mot. at 12), the facts in the complaint give rise to a strong inference of retaliatory animus.

First, in 2019, after Buchanan and Carayannis criticized the agency's proposed BWC policy, Darche called Buchanan, "enraged by the criticisms, and shouted: 'Who do I need to fire, Olas and you, or Olas, you, Chris [Duerr] and Winsome [Thelwell]?'" (Compl. ¶ 32b.) Next, in July 2020, after Buchanan and Carayannis's subsequent memo was leaked to the press, Darche "repeatedly threatened that their roles within the CCRB would suffer as a result" and instructed Duerr and Thelwell to "restructure Buchanan's and Carayannis's jobs so as to functionally demote them." (*Id.* ¶ 32d-e.)

That same month, Duerr, Buchanan, and Thelwell circulated a memorandum criticizing a CCRB agreement with the NYPD officers' union. Late that evening, Darche and General Counsel Kadushin called Duerr to express their anger. Darche warned that he "always comes out on top," and remarked that he was "done making concessions" to Thelwell; Kadushin added that they "had a plan on how to deal with her." (*Id.* ¶ 35b.) Finally, when Napolitano submitted a memorandum on the pattern of CCRB Board "flips," Kadushin told her the document was a "problem" and admonished her that "[n]obody told you to write that memo." (*Id.* ¶ 34a.)

It is hard to imagine evidence of retaliatory animus *more* direct than Darche's repeated insistence, in no uncertain terms, that he intended to terminate or demote plaintiffs for their speech. Indeed, such clear statements of retaliatory intent are unusual, contrasting with the more subtle innuendos that courts generally find to constitute evidence of animus. *Cf., e.g., Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (finding direct evidence of retaliatory animus in supervisor's statement that the plaintiff "would have to learn to keep his mouth shut"); *White v. Dep't of Corr. Servs.*, 814 F. Supp. 2d 374, 390 (S.D.N.Y. 2011) (finding evidence of animus in employer's statement that he "did not know what was wrong with [plaintiff]" after she engaged in protected speech).

Moreover, the facts surrounding plaintiffs' termination provide additional circumstantial evidence of retaliation. Plaintiffs were provided no prior notice of their termination, and they were disconnected from the CCRB server, including email, almost immediately after they learned of their firing. (Compl. ¶¶ 44-45.) All four plaintiffs— each of whom faced direct reprimand during the summer of 2020 for engaging in similar forms of speech on similar topics—were fired on the same day. (*Id.* ¶ 43.) Finally, plaintiffs were terminated only approximately four months after the core incidents underpinning their First Amendment claims.

Defendants contend that this four-month time lapse is too protracted to demonstrate a causal link. However, it is only "[w]hen a party relies on the *mere* temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . that the temporal proximity must be very close." *Raymond v. City of New York*, 317 F. Supp. 3d 746, 773–74 (S.D.N.Y. 2018) (emphasis added) (quoting *Payson v. Bd. of Educ. of Mount Pleasant Cottage Sch., USFD*, No. 14-Cv-09696, 2017 WL 4221455, at *13 (S.D.N.Y. Sept. 20, 2017)); *see Mandell*, 316 F.3d at 384. But here, that temporal proximity combines with numerous direct and circumstantial indicia of a causal link between plaintiffs' protected speech and their subsequent terminations. *See White*, 814 F. Supp. 2d at 390-91 ("The direct evidence of retaliatory animus adduced by the plaintiff, as well as the temporal proximity between the union complaint and the notice of discipline, are sufficient . . . with respect to the causal

connection element[.]"). Accordingly, plaintiffs have pled a viable First Amendment retaliation claim for purposes of this Rule 12(b)(6) motion.

### 4. *Defendant Darche Is Not Entitled to Qualified Immunity at This Stage of the Proceedings*

Defendants next urge that even if plaintiffs allege a valid First Amendment claim, Darche, as an individual defendant, is entitled to qualified immunity. "Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "[W]hen an official raises qualified immunity as a defense, the court must consider whether: '(1) . . . the official violated a statutory or constitutional right, and (2) . . . the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)).

In defining a "clearly established" right, "the focus is 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). This inquiry does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Qualified immunity, however, "is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). And plaintiffs, "in order to state a claim of constitutional violation, need not plead facts showing the *absence* of such a defense." *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994) (emphasis added). Thus, "as a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.'" *Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). For such a motion to succeed, "[n]ot only must the facts supporting the defense appear on the face of the complaint"; in addition, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). "Put another way, advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Chamberlain*, 960 F.3d at 111.

Defendants "do not clear this high bar." *Id.* On the contrary, Darche's qualified-immunity defense hinges on the same disputed issues of fact discussed in depth above. Indeed, defendants concede that, under Second Circuit precedent, when a public employee "whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be

expected to engage," she speaks as a citizen. *Matthews*, 779 F.3d at 174. Defendants argue, however, that no clearly established law holds "that high-ranking employees who *do* provide feedback on policy issues as part of their job duties" speak as citizens. (Defs.' Mot. at 15.)

This argument begs the precise question presented here, and merely repackages defendants' same contention, rejected above, that plaintiffs possess "high-ranking" job titles. Plaintiffs, again, do not concede that they were high-ranking employees whose job duties included "formulating, implementing, or providing feedback" on the policies they challenged. Instead, plaintiffs allege, unsurprisingly, that their memoranda and emails were *not* in furtherance of their professional responsibilities. (Compl. ¶ 29.) It is this inquiry into "the nature of the plaintiff[s'] job responsibilities, the nature of the speech, and the relationship between the two," *Ross*, 693 F.3d at 306, for which discovery is needed. So too will Darche's entitlement to qualified immunity hinge on those same contested facts.

### 5.   *Plaintiffs Fail to State a* **Monell** *Claim Against the City of New York*

Defendants next move to dismiss plaintiffs' First Amendment claim against the City of New York. In order to establish municipal liability under 42 U.S.C. § 1983—known as a *Monell* claim—a plaintiff must demonstrate "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020); *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). *Monell* "expressly prohibits *respondeat superior* liability for cities," *id.* (citing *Monell*, 436 U.S. at 691), so a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

A "policy or custom," for purposes of *Monell* liability, may be shown through "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The Second Circuit has held that "a single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy, can, by itself, support a claim against a municipality." *Littlejohn*, 795 F.3d at 315 (quoting *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004)). "It does not suffice . . . that the official has been granted discretion in the performance of his duties. '[O]nly those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability.'" *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)). "Whether the official in question possessed final

policymaking authority is a legal question, which is to be answered on the basis of state law." *Id.*

Plaintiffs claim that Darche, as Executive Director of the CCRB, possesses final policymaking authority with respect to employment decisions. Plaintiffs point to the New York City Charter, which vests in city agency heads various "powers, duties and responsibilities for personnel management," N.Y.C. Charter § 812(b), including the power "to appoint and remove" employees, *id.* § 815(f). Defendants, meanwhile, contend that plaintiffs conflate Darche's *decision*-making authority over CCRB employment matters with his authority to set municipal *policy* on those matters. Defendants direct the Court to section 814 of the New York City Charter, which vests the Commissioner of the Department of Citywide Administrative Services ("DCAS") with the authority to set binding, citywide public employment policy. N.Y.C. Charter § 814(b); *see also City of New York v. City Civ. Serv. Comm'n*, 60 N.Y.2d 436, 442 (N.Y. 1983).

The appropriate level at which to locate "final policymaking authority" over New York City personnel decisions has caused some confusion in this Circuit. As plaintiffs point out, some courts have found an agency head's ability to take personnel actions "without the need for intervention from any higher authority" sufficient to constitute final policymaking authority. *Thelwell v. City of New York*, No. 13-Cv-1260 (JGK), 2015 WL 4545881, at *20 (S.D.N.Y. July 28, 2015); *see also, e.g., Stajic v. City of New York*, No. 16-Cv-1258-GHW, 2018 WL 4636829, at *13 (S.D.N.Y. Sept. 27, 2018); *Zambrano-Lamhaouhi v. New York City Bd. of Educ.*, 866 F. Supp. 2d 147, 175 (E.D.N.Y. 2011). Others have disagreed, focusing on the DCAS Commissioner's "final authority . . . to formulate the rules governing personnel decisions rather than the [agency head's] authority to make decisions pursuant to those rules." *Gittens-Bridges v. City of New York*, No. 19-Cv-272 (ER), 2020 WL 3100213, at *13 (S.D.N.Y. June 11, 2020) (quoting *Chin v. New York City Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008)); *see also, e.g., Adams-Flores v. City of New York*, No. 18-Cv-12150 (JMF), 2020 WL 996421, at *7 (S.D.N.Y. Mar. 2, 2020); *Daniels v. City of New York*, No. 17-Cv-9960 (LGS), 2019 WL 251511, at *7 (S.D.N.Y. Jan. 17, 2019).

The Second Circuit's recent decision in *Agosto v. New York City Department of Education* helped clarify this inquiry. 982 F.3d 86, 97 (2d Cir. 2020). Plaintiff Agosto, a public-school teacher, claimed that his school's principal had retaliated against him for protected speech. As here, Agosto alleged *Monell* liability on the theory that the principal acted as a final policymaker within the school. *Id.* at 98. The panel rejected this argument, noting that under state law, school principals are "'subject to the regulations of the chancellor,' who possesses expansive powers to make policy for . . . New York City schools." *Id.* (quoting N.Y. Educ. Law § 2590-i). The panel further reprimanded lower courts for "erroneously equating a principal's final decisions with a municipality's final policies," *id.* at 100-101, and re-centered the inquiry on whether a

defendant's "'edicts or acts' would be considered to 'represent official policy' for the entire municipality," *id.* at 98 (quoting *Monell*, 436 U.S. at 694).

Relevant here, the Second Circuit explained that "even when the official 'is the apex of a bureaucracy,' that merely 'makes the decision final but does not forge a link between finality and policy.'" *Id.* at 101 (quoting *Hurdle v. Board of Education of City of New York*, 113 F. App'x 423 (2d Cir. 2004)). Indeed, "'[a]ny city acts exclusively through agents' . . . . [B]y equating a final decisionmaker with a final policymaker, [defendants'] approach would effectively impose *respondeat superior* liability—making the municipality liable for the conduct of its employees—in violation of *Monell* itself." *Id.* at 100-101 (quoting *Hurdle*, 113 F. App'x at 427).

Accordingly, Darche's authority over CCRB employment decisions, without more, cannot support a *Monell* claim against the entire municipality. It may be true that Darche is a final decisionmaker with respect to CCRB employment matters. But "the relevant municipal entity in this case" is the City of New York, not the CCRB. *Id.* at 99; *cf. Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992). And the New York City Charter vests final authority to "establish and enforce standards, guidelines and criteria" governing citywide employment policy with the DCAS Commissioner. N.Y.C. Charter § 814(b)(3); *cf. Littlejohn v. City of New York*, 795 F.3d at 315 (2d Cir. 2015) ("The Charter vests policymaking authority with respect to personnel decisions with [the DCAS Commissioner.]" (quoting *Soto v. Schembri*, 960 F. Supp. 751, 759 (S.D.N.Y. 1997)));[7] *City of New York v. City Civ. Serv. Comm'n*, 60 N.Y.2d 436, 442 (1983) (holding

---

[7] Defendants contend that the Second Circuit's decision in *Littlejohn* "fully embraced" the position that final policymaking authority rests with the DCAS Commissioner. (Defs.' Mot. at 7.) This contention overstates *Littlejohn's* holding. There, a municipal employee who was demoted by an agency head's chief of staff brought suit, alleging *Monell* liability. *Littlejohn*, 795 F.3d at 314-15. A panel of the Second Circuit rejected her claim, noting that a chief of staff is "not a final municipal policymaker such that her isolated personnel decision to demote [plaintiff] could be said to represent official City policy." In support of this unremarkable proposition, the panel cited a 1997 district court opinion in *Soto v. Schembri*, and included an explanatory parenthetical quoting *Soto's* holding that "[t]he [New York City] Charter vests policymaking authority with respect to personnel decisions with the [DCAS Commissioner]." *Littlejohn*, 795 F.3d at 315 (quoting *Soto*, 960 F. Supp. at 759).

The Court here holds that the best reading of the New York City Charter, in light of *Agosto*, assigns the DCAS Commissioner, and not agency heads, final policymaking authority for municipal employment purposes. But the Court does not read *Littlejohn* to hold as much, based on only its parenthetical citation to a two-decade-old district court opinion. Since *Littlejohn*, several district courts have cited this parenthetical as binding precedent. *See, e.g., Johnson v. City of New York*, No. 18-CV-9600 (AJN), 2020 WL 2036708, at *3 (S.D.N.Y. Apr. 28, 2020); *Adams-Flores*, 2020 WL 996421, at *7 (S.D.N.Y. Mar. 2, 2020); *Daniels*, 2019 WL 251511, at *7. This Court believes such a significant holding warrants substantive treatment from the Second Circuit in an action that squarely presents the question.

that the DCAS Commissioner's predecessor "has both policy-making authority and functional responsibility for civil service matters in New York City"). Whatever agency-specific personnel policies Darche may establish, he remains subject to the DCAS Commissioner's higher authority to preempt and reverse those policies. *See Agosto*, 982 F.3d at 98 ("The authority to make policy 'necessarily' means 'the authority to make *final* policy.'" (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988))). Because Darche's personnel decisions cannot be considered to "represent official policy" for the municipality, *Monell*, 436 U.S. at 694, plaintiffs' First Amendment claim against the City of New York must be dismissed.

## D. Plaintiffs Have No Private Right of Action Under the New York State Constitution

Plaintiffs also purport to bring a parallel free-speech claim under Article I, Section 8 of the New York State Constitution. In contrast to 42 U.S.C. § 1983, which creates a private right of action for state officials' violations of the federal Constitution, "[n]o explicit constitutional or statutory authority sanctions a private right of action for violations of the New York State Constitution." *Wahad v. FBI*, 994 F. Supp. 237, 238 (S.D.N.Y. 1998). Following the U.S. Supreme Court's reasoning in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the New York State Court of Appeals has recognized a "narrow" implied cause of action where no other remedy is available. *Brown v. State of New York*, 89 N.Y.2d 172, 192 (1996). However, "it is a common view among District Courts in this Circuit that there is no right of action under the New York State Constitution for claims that can be brought under § 1983." *Raymond v. City of New York*, No. 15-Cv-6885 (LTS), 2017 WL 892350, at *8 (S.D.N.Y. Mar. 6, 2017) (quoting *Dava v. City of New York*, No. 15-Cv-08575 (ALC), 2016 WL 4532203, at *10 (S.D.N.Y. Aug. 29, 2016)); *see also, e.g., Hollins v. City of New York*, No. 10-Cv-1650 (LGS), 2014 WL 836950, at *14 (S.D.N.Y. Mar. 3, 2014); *Davis v. City of New York*, 959 F. Supp. 2d 324, 368 (S.D.N.Y. 2013).

Plaintiffs here assert First Amendment retaliation claims pursuant to section 1983. Moreover, "free speech claims under Article 1, Section 8 of the New York State Constitution are subject to the same analysis as free speech claims under the First Amendment." *Carter v. Inc. Vill. of Ocean Beach*, 693 F. Supp. 2d 203, 212 (E.D.N.Y. 2010). Accordingly, plaintiffs cannot bring a separate cause of action under the state Constitution, and this claim must be dismissed.

## E. Plaintiffs Fail to State a Claim Under the NYSHRL and NYCHRL

Finally, plaintiffs bring claims pursuant to this Court's supplemental jurisdiction, 28 U.S.C. § 1367, alleging conduct in violation of the NYSHRL, N.Y. Exec. Law §§ 290 *et seq.*, and the NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq.* Plaintiffs contend that they faced unlawful retaliation based on their opposition to discriminatory CCRB practices.

### 1.  *Legal Standard for NYSHRL and NYCHRL Retaliation Claims*

To state a retaliation claim under the NYSHRL, a plaintiff must allege "1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). "The elements of retaliation under the NYCHRL differ only in that the plaintiff need not prove any adverse employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (quoting *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d 491, 509 n. 12 (S.D.N.Y. 2010)).

Protected activities include "action[s] taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotation omitted); *see* NYSHRL § 296(1)(e); NYCHRL § 8-107(7). A plaintiff "need not establish that the conduct she opposed was actually a violation of [the NYSHRL or NYCHRL], but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Id.* at 126 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). "Opposition" includes not only the filing of formal complaints, but also "informal protests of discrimination, including making complaints to management . . . and expressing support of co-workers who have filed formal charges." *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013) (quoting *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000)).

### 2.  *Plaintiffs Have Not Alleged a Causal Connection Between Any Protected Activity and Their November 2020 Termination*

Plaintiffs list four occasions on which they allegedly "took steps to oppose" discriminatory behavior by Darche. (Compl. ¶ 37.) First, the complaint describes a 2019 incident in which Darche berated Duerr and Thelwell after they registered opposition to the "CCRB's 911 Incident/Policy." (*Id.* ¶ 41.) Next, in early 2020, Darche recommended that Thelwell apply for a job at a Jamaican police oversight agency. (*Id.* ¶ 42.) Third, during the COVID-19 pandemic, Thelwell raised concerns about the fact that black clerical workers were still required to work in-person, while white investigators were told it was unsafe to return to the office. (*Id.* ¶ 40.) Finally, all four plaintiffs claim that they faced retaliation for supporting Carayannis's allegations of gender-identity discrimination. (*Id.* ¶ 39.)

The first two of these incidents stumble on the first prong of the retaliation inquiry: they fail to allege that plaintiffs opposed any discriminatory practice. Despite courts'

"expansive interpretation of the opposition clause," *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 n.7 (2d Cir. 2012), plaintiffs still must plead that they communicated *some* form of opposition to their employers, *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (defining "oppose" in Title VII by "its ordinary meaning: [t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand" (quoting Webster's New International Dictionary 1710 (2d ed. 1957)) (citation omitted)).[8]

Here, at a December 11, 2019 staff meeting, Duerr and Thelwell allege that Darche "verbally attacked and threatened" them after they opposed a CCRB policy relating to 911 incidents. (*Id.* ¶ 41.) Darche told them "they were both fired, effective immediately," a mandate he later retracted. (*Id.*) When Thelwell, who is black, did not leave the room, Darche told her that "not only was she fired but that he would call 911 on her." (*Id.*) He did not make any similar threats to Duerr, who is white.

Plaintiffs do not claim that Thelwell and Duerr's disagreement with the CCRB's 911 policy itself constituted opposition to some form of discriminatory practice. Instead, plaintiffs contend that Darche's actions in *response* to their disagreement—"aggressively point[ing] at . . . Thelwell, towering and leaning over her," and threatening to call 911 (*Id.*)—constituted racial discrimination in violation of law. *See* NYSHRL § 296(1); NYCHRL § 8-107(1). However, the complaint does not indicate that Thelwell expressed any form of *opposition* to this perceived discrimination. *See, e.g., Raucci v. Ctr. for Disability Servs., Inc.*, No. 19-Cv-1002 (MAD), 2020 WL 777269, at *5 (N.D.N.Y. Feb. 18, 2020) ("Nothing in the amended complaint indicates whether Plaintiff expressed any opposition to the [discrimination.]"). Accordingly, this incident alleges no "protected activity" based on which Thelwell could have faced subsequent retaliation.

The same analysis applies to Darche's statement, in early 2020, that Thelwell should "see if she could get a job" at a Jamaican police oversight agency. (Compl. ¶ 26.) Plaintiffs claim that this comment, too, constituted racial discrimination, as it suggested that Thelwell, a 25-year-resident of New York City, "should return to her country of origin." (*Id.*) Again, however, the complaint fails to indicate that Thelwell expressed any opposition to Darche's allegedly discriminatory conduct, and so this incident cannot support Thelwell's retaliation claim.

Plaintiffs' third cited incident, in which Thelwell opposed perceived disparate treatment for black clerical workers, also fails to support Thelwell's claim. This conversation took place "in the midst of the COVID-19 pandemic," at which time the agency had three black clerical workers continue to work in-person at the office. (*Id.* ¶ 40.) When "White Investigators asked to return to the office," however, "Darche said it

---

[8] NYSHRL claims are "analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997). Accordingly, interpretations of Title VII apply with equal force to NYSHRL claims.

was not safe." (*Id.*) Thelwell raised the inconsistency, "noting the disparate impact COVID has on communities of color," but "Darche and Kadushin told her it was none of her business." (*Id.*)

In contrast to the first two incidents, Thelwell's statements here likely amount to protected conduct. The NYSHRL and NYCHRL ban discriminatory treatment on the basis of race, *see* NYSHRL § 296(1); NYCHRL § 8-107(1), and Thelwell may have "possessed a good faith, reasonable belief that the underlying employment practice was unlawful," *Summa v. Hofstra Univ.*, 708 F.3d at 126.[9] Nonetheless, this incident falters on the final prong of the retaliation inquiry: it fails to demonstrate a "causal connection between the protected activity and the adverse employment action." *Jute*, 420 F.3d at 173.

As in the First Amendment context, a causal connection between protected conduct and a retaliatory action may be demonstrated "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Here, Darche and Kadushin's statement that the in-person employment disparity was "none of [Thelwell's] business" does not rise to the level of evincing retaliatory animus. Moreover, plaintiffs fail to specify when the conversation occurred in relation to Thelwell's termination; the complaint notes only that it took place "in the midst of the COVID-19 pandemic," a phrase that lends little clarity. Absent any such direct or indirect evidence, the Court cannot infer a causal connection from this event.

Plaintiffs' state-law claims thus rest on their support of Carayannis's gender-identity discrimination complaint. *See* NYSHRL § 296(1) (forbidding discrimination on the basis of gender identity); NYCHRL § 8-107(1) (same). Indeed, for all plaintiffs other

---

[9] Defendants contest this point on the grounds that such a belief would not have been "reasonable." Under the NYSHRL and NYCHRL, disparate treatment gives rise to an inference of discrimination when the compared employees are "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). According to defendants, because clerical workers are "by no means 'similarly situated in all material respects' to investigators," any belief by Thelwell that the CCRB's disparate practices were unlawful was unreasonable. However, the Second Circuit has "backed away from a rigid interpretation" of the "similarly situated" test, recognizing that "'all material respects' . . . varies somewhat from case to case," and requires "an examination of the context and surrounding circumstances." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). Moreover, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Id.* In light of this situation-specific analysis, and given the unprecedented nature of the COVID-19 pandemic, the Court cannot say, for purposes of this Rule 12(b)(6) motion, that Thelwell's belief was objectively unreasonable.

than Thelwell, this support is the sole predicate for their retaliation claims. Plaintiffs allege that they "openly supported" Carayannis, who filed an internal grievance in August 2020 describing "discriminatory and hostile behavior by Darche" based on Carayannis's transgender/gender non-conforming status. (Compl. ¶ 39.) Plaintiffs set forth only one occasion, however, on which they expressed their support: in August or September 2020, plaintiffs "intended to address a meeting to address [Carayannis's] complaint," but "they were refused attendance by Kadushin." (*Id.*)

This single attempt to attend an internal meeting is insufficient, without more, to support a cause of action under the NYSHRL or NYCHRL. Plaintiffs argue that Kadushin and Darche would have understood this attempt to support Carayannis as an expression of opposition to discrimination. *Cf. Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). However, even assuming this is so, the Court nonetheless again cannot infer from this incident any causal connection to plaintiffs' November 2020 termination.

Plaintiffs have pled no direct or circumstantial evidence that this event led to their subsequent firing. Plaintiffs do not specify precisely when this meeting occurred, but it appears to have taken place approximately three months before they were terminated. When a plaintiff rests on "mere temporal proximity between an employer's knowledge [of a] protected activity and an adverse employment action as sufficient evidence of causality," courts "uniformly hold that the temporal proximity must be 'very close.'" *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (collecting cases). This inquiry is not subject to a "bright line" test, and the Court must "exercise its judgment about the particular inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). In this particular case, where plaintiffs' sole factual contention is that they attempted to attend an internal meeting to address another employee's discrimination complaint, the Court cannot infer such a causal link based on three months' temporal proximity alone.[10]

Accordingly, plaintiffs' NYSHRL and NYCHRL claims are dismissed. It is true that NYCHRL claims "must be reviewed independently from and 'more liberally' than" NYSHRL claims. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66-69 (1st Dep't 2009)).

---

[10] The complaint also alleges that Carayannis filed a formal EEOC complaint on September 29, 2020, in which he named all four plaintiffs as potential witnesses. (Compl. ¶ 39.) However, defendants' motion to dismiss demonstrates that this complaint was not filed until January 8, 2021, by which time plaintiffs had already been terminated. (*See* Rubenstein Decl. Ex. B, ECF No. 21.) In response, plaintiffs clarify that Carayannis submitted an EEOC online intake form on September 29 and listed plaintiffs as potential witnesses. (Pordy Decl. Ex. A, ECF No. 26.) The complaint does not allege, however, that defendants had knowledge of this intake form at the time of plaintiffs' termination.

However, the NYCHRL still requires plaintiffs to plead both a protected activity and a causal connection in order to state a retaliation claim. And plaintiffs here "offer[] no independent argument for why this cause of action should survive if [their] NYSHRL claim does not." *Roenick v. Flood*, No. 20-Cv-7213 (JPC), 2021 WL 2355108, at *7 (S.D.N.Y. June 9, 2021). Thus, even under the NYCHRL's "more liberal" standard, these claims must be dismissed as well.

## III. CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the complaint is granted in part and denied in part. Defendant CCRB is dismissed from the action. Plaintiffs' First Amendment claims may proceed against defendant Darche. Plaintiffs' municipal-liability claim against the City of New York is dismissed. Plaintiffs' claims under the New York State Constitution, New York State Human Rights Law, and New York City Human Rights Law are dismissed as well. As a result, this action shall proceed against the Executive Director of the CCRB on plaintiffs' claims that he unlawfully retaliated against them in violation of the First Amendment. Discovery proceedings should focus on elucidating plaintiffs' functional day-to-day job responsibilities, whether they opposed CCRB policies and practices in furtherance of these duties, and whether their speech led to their November 2020 termination. *Matthews*, 779 F.3d at 173-74.

Dated: New York, New York
       August 23, 2021

SO ORDERED:

Sidney H. Stein, U.S.D.J